**Gary CLARK, Larry Dyer, Gerald Gallagher, Robert Naslanic, Dwight Walker and Mary Knox, Plaintiffs,**

v.

**James F. ESSER, Jim Cianciolo, Betty Cardinal, Leon Cooper, Greg Lowran, Rick Oliver, David Witulski, Bill Duttman and Teamsters Local 243, Defendants.**

No. 92–CV–72341–DT.

United States District Court, E.D. Michigan, Southern Division.

Oct. 23, 1995.

 

Ellis Boal, Detroit, Michigan, for plaintiffs.

Curtis G. Rundell, II, Troy, Michigan, for defendants.

***OPINION AND ORDER DENYING DE-
FENDANTS' MOTION FOR JUDG-
MENT NOTWITHSTANDING THE
VERDICT AND THE INDIVIDUAL
DEFENDANTS' MOTION FOR RE-
LIEF FROM JUDGMENT***

ROSEN, District Judge.

## I. INTRODUCTION

Plaintiffs, members of a political caucus known as "rank and file teamsters" or

"RAFT" within Teamsters Local 243, instituted this action against Defendants, members of a political caucus known as "Esser–Cinci" within Local 243 and Local 243 itself, claiming that Defendants deprived Plaintiffs of their right to free expression, as protected by the Labor–Management Reporting and Disclosure Act ("LMRDA," or "Landrum–Griffin Act"), 29 U.S.C. 411(a)(2). In particular, Plaintiffs claim that the individual Defendants filed a retaliatory defamation, libel, and slander action against them in state court. The individual Defendants, whose state court defamation case was dismissed, filed a defamation counterclaim against Plaintiffs in the instant matter.

The case was tried before a jury on June 21 through 25, 1993. At the close of Plaintiffs' case, Defendants made an oral motion for directed verdict, which was denied by the Court. On July 15, 1993, after a jury rejected Defendants' defamation counterclaim and returned a verdict in favor of Plaintiffs in the amount of $30,000, Defendants filed the instant motion seeking judgment as a matter of law on Plaintiffs' Landrum–Griffin Act claim, or, in the alternative, a new trial.

While this motion was pending, this Court was informed that Mr. Francis J. Kortsch, counsel for Defendant Local 243, had been suspended from the practice of law by the State of Wisconsin prior to the trial. Because Mr. Kortsch's admission to practice in this Court was premised on his good standing in his home state of Wisconsin, this Court conducted a hearing to determine what action, if any, was necessitated by Mr. Kortsch's Wisconsin suspension. As a consequence, Mr. Kortsch was barred from continuing his representation of Defendant Local 243, and consideration of the instant motion was delayed until Local 243 could obtain new counsel.[1] On November 1, 1994, Defendant Local 243's new counsel filed a supplemental brief in support of Defendants' motion. Plaintiffs responded to the brief filed by Mr. Kortsch on August 11, 1993, and to the supplemental brief on December 5, 1994;

Defendant Local 243 replied on December 9, 1994.

Next, on April 3, 1995, the individual Defendants filed a motion for relief from judgment, or in the alternative for a stay of execution of that judgment. The individual Defendants assert that it was "understood by all" throughout the trial that liability for Plaintiffs' LMRDA claims could rest only with Defendant Local 243. By order dated April 24, 1995, this Court granted the motion for a stay of execution pending resolution of Defendants' outstanding motions.

Having considered all of the documents filed by the parties, as well as the arguments made by their counsel at a hearing held on this matter on August 23, 1995, and for the reasons stated below, the Court hereby denies Defendants' request for judgment as a matter of law or for a new trial, and denies the individual Defendants' motion for relief from judgment.

## II. STANDARD OF REVIEW

■ The standards governing consideration of a motion for judgment as a matter of law, whether considered before or after submission of the case to the jury, are as follows:

> Viewing the evidence in the light most favorable to the party against whom the motion is made, a directed verdict is proper if reasonable minds could only come to a conclusion against the non-movant. In coming to this conclusion neither the credibility or weight of the evidence should be considered.

*Littlejohn v. Rose,* 768 F.2d 765, 770 (6th Cir.1985), *cert. denied,* 475 U.S. 1045, 106 S.Ct. 1260, 89 L.Ed.2d 570 (1986). Furthermore, a post-verdict motion for judgment as a matter of law will be considered only if a similar motion was made before the jury charge. *See* Fed.R.Civ.P. 50(a)(2) and 50(b).

■ Turning to the motion for new trial, Federal Rule of Civil Procedure 59 states that "[a] new trial may be granted ... for any of the reasons for which new trials have been granted in actions at law in the courts

---

1. After the hearing, this Court also found Mr. Kortsch in contempt of Court for violation of his

obligation under Local Rule 111.1(b).

of the United States...." Specific grounds for new trial can include:

> that the verdict is against the weight of the evidence, that the damages are excessive, or that for other reasons the trial was not fair, and that the motion may also raise questions of law arising out of substantial errors in the admission or rejection of evidence or the giving or refusal of instructions.

11 Charles A. Wright & Arthur R. Miller, *Federal Practice & Procedure* § 2805, at 37–38 (1973).

 "The grant of a new trial ... falls within the trial court's discretion to act to prevent a miscarriage of justice." *Fryman v. Federal Crop Ins. Corp.*, 936 F.2d 244, 248 (6th Cir.1991). This broad discretion vested in the trial court in deciding a Rule 59 motion for new trial extends to motions predicated upon the sufficiency of the evidence and errors in jury instructions. *See City of Cleveland v. Peter Kiewit Sons' Co.*, 624 F.2d 749 (6th Cir.1980). *See generally* C. Wright and A. Miller, 11 *Federal Practice and Procedure* § 2818 and cases cited therein.

Federal Rule of Civil Procedure 61 makes clear that the court must disregard any error or defect in the proceeding which does not affect the substantial rights of the parties. It provides, in pertinent part:

> No error in either the admission or the exclusion of evidence and no error or defect in any ruling or order or in anything done or omitted by the court or by any of the parties is grounds for granting a new trial ... unless refusal to take such action appears to the court inconsistent with substantial justice. The court at every stage of the proceeding must disregard any error or defect in the proceedings which does not affect the substantial rights of the parties.

The Court will apply the above principles in deciding Defendants' motion for judgment notwithstanding the verdict or for a new trial.

### III. *ARGUMENTS OF THE PARTIES*

Defendants make several arguments in support of their motion for judgment notwithstanding the verdict or for a new trial. In their initial brief (filed by Francis Kortsch on July 15, 1993), they argue:

I. Lack of subject matter jurisdiction because the state court litigation, however construed, does not constitute "discipline" under § 411 of the Landrum–Griffin Act.

II. Insufficient evidence of union complicity in preparing or advancing the state court action.

III. Insufficient evidence that the state court action was filed for an improper purpose.

IV. Failure to exhaust internal union remedies.

In a supplemental brief (filed by Defendant Local 243's new counsel on November 1, 1994), Defendants also argue:

V. Because the First Amendment protects the right of citizens to petition the courts for redress of grievances, the commencement of a public proceeding against a union member can never constitute an actionable infringement of his rights, or at most can constitute an infringement only if it is a "sham" proceeding.

As a result of this alleged failure of the Court to properly construe the law, Defendant Local 243 argues that improper jury instructions were given.

In addition to attacking the merits of these contentions, Plaintiffs also contend that arguments I, IV and V should not be addressed by this Court due to Defendants' failure to raise these points of law in their initial motion for directed verdict,[2] and their failure to object to the jury instructions.

---

**2.** Although the parties refer to the motion raised by Defendants at the close of Plaintiffs' case-in-chief as a "motion for directed verdict," the 1991 amendments to Federal Rule of Civil Procedure 50 abandoned the term "directed verdict" in favor of the more precise term "judgment as a matter of law." *See* Fed.R.Civ.P. 50(a) Advisory

Committee's Note (1991 Amendment). However, because the parties have employed the "directed verdict" terminology, the Court, rather than standing on linguistic formalities, adopts the parties' terminology when discussing this motion.

Regarding the individual Defendants' motion for relief from judgment, Defendants contend that the trial was conducted with the implicit understanding, by all parties, that only Defendant Local 243 could be held liable for any infringement of Plaintiffs' rights under Title I of the Landrum–Griffin Act. Accordingly, the individual Defendants conclude that the judgment of this Court holding *all* of the Defendants liable reflects a "clerical mistake" that should be corrected by issuing an amended judgment naming only Defendant Local 243. Plaintiffs respond that their complaint properly named both the individual Defendants and Local 243, and that their trial brief explicitly asserted the joint and several liability of the Local and the members of "Esser–Cinci."

## IV. *ANALYSIS*

### A. *THIS COURT WILL ADDRESS DEFENDANTS' ARGUMENTS DESPITE THEIR FAILURE TO RAISE THEM IN THEIR MOTION FOR DIRECTED VERDICT OR TO OBJECT TO THE JURY INSTRUCTIONS.*

Defendants' motion for directed verdict after the completion of Plaintiffs' case-in-chief rested exclusively on the alleged insufficiency of the evidence to establish either union complicity or improper motive in filing the state lawsuit. Furthermore, Defendants did not object to the jury instructions given by the Court. Plaintiffs contend that because arguments I, IV, and V above were not raised in Defendants' motion for directed verdict, they may not be raised in a subsequent motion for judgment notwithstanding the verdict. Moreover, to the extent that argument V above asserts that the jury was improperly instructed, Plaintiffs argue that Defendants' failure to object to the jury instructions at trial bars them from objecting to those instructions in a post-trial motion.

Federal Rule of Civil Procedure 50 controls this Court's decision whether to grant a motion for judgment notwithstanding the verdict. Rule 50(a)(2) specifies the requirements for a motion for directed verdict:

Motions for judgment as a matter of law may be made at any time before submission of the case to the jury. Such a motion shall specify the judgment sought and the law and the facts on which the moving party is entitled to judgment.

Rule 50(b) governs the renewal of this motion after trial:

Whenever a motion for a judgment as a matter of law made at the close of all the evidence is denied or for any reason is not granted, the court is deemed to have submitted the action to the jury subject to a later determination of the legal questions raised by the motion.

■ The plain language of the Rule thus indicates that a motion for judgment notwithstanding the verdict is nothing more than the renewal of a previous motion for directed verdict; it follows that no new grounds can be asserted in the renewed motion. The Advisory Committee adopted this straightforward interpretation in its discussion of the 1991 amendments to the Rule, and also explained the purpose behind the Rule's requirements:

Paragraph (a)(2) retains the requirement that a motion for judgment be made prior to the close of the trial, subject to renewal after a jury verdict has been rendered. The purpose of this requirement is to assure the responding party an opportunity to cure any deficiency in that party's proof that may have been overlooked until called to the party's attention by a late motion for judgment....

The second sentence of paragraph (a)(2) does impose a requirement that the moving party articulate the basis on which a judgment as a matter of law might be rendered. The articulation is necessary to achieve the purpose of the requirement that the motion be made before the case is submitted to the jury, so that the responding party may seek to correct any overlooked deficiencies in the proof. The revision thus alters the result in cases in which courts have used various techniques to avoid the requirement that a motion for directed verdict be made as a predicate to a motion for judgment notwithstanding the verdict....

\* \* \* \* \* \*

[Rule 50(b) ] retains the concept of the former rule that the post-verdict motion is a renewal of an earlier motion made at the close of the evidence.... It remains useful as a means of defining the appropriate issue posed by the post-verdict motion. *A post-trial motion for judgment can be granted only on grounds advanced in the pre-verdict motion.*

Fed.R.Civ.P. 50 Advisory Committee's Note (1991 Amendment) (citations omitted) (emphasis added). Therefore, the Advisory Committee Notes—not to mention the language of the Rule itself—clearly support Plaintiffs' contention that this Court should not consider any arguments Defendants raised only in their "renewed" motion.

In response, Defendants argue that "technicalities" should not foreclose their presentation of new arguments, and that these new arguments in any event are only "minor variances" from the points raised in their motion for directed verdict. However, most of the cases cited by Defendant in support of this position involve only the failure of a party to *renew* its motion for judgment as a matter of law at the close of all the evidence. *See, e.g., Miller v. American President Lines, Ltd.,* 989 F.2d 1450, 1465 (6th Cir.1993); *Riverview Invs., Inc. v. Ottawa Community Improvement Corp.,* 899 F.2d 474, 477–78 (6th Cir.1990); *Boynton v. TRW, Inc.,* 858 F.2d 1178, 1185 (6th Cir.1988). Those cases thus did not need to address the possibility of prejudice to the party opposing the motion, because that party was properly advised of the basis for the motion in the earlier motion for directed verdict.

Two cases, however, do offer some support for Defendants' argument. First, in *National Indus., Inc. v. Sharon Steel Corp.,* 781 F.2d 1545, 1549 (11th Cir.1986), the court found that a renewed motion for judgment as a matter of law presented arguments that were "closely related" to those raised in the initial motion. The court further stated that "[e]ven if the subject matters of the two motions were much farther apart, we would not read Rule 50(b) so narrowly as [the opposing party] urges us to do." 781 F.2d at 1549. Reasoning that Rule 50 is designed to ensure that the party opposing a motion is

adequately informed of the basis for the motion, the court found that "[t]here is nothing in the record to suggest an ambush or sandbagging." 781 F.2d at 1549. Similarly, the court in *Parkway Garage, Inc. v. City of Philadelphia,* 5 F.3d 685, 691 (3d Cir.1993), found Rule 50 satisfied where the moving party's "implicit" and "oblique" references to an issue were sufficient to put the opposing party on notice that the issue was contested.

■ Because Defendants' first "new" argument—i.e., that state court litigation does not constitute "discipline" under the Landrum–Griffin Act—presents a purely legal issue, and because Defendants' counsel referred at trial to a case that considers this argument, Defendants assert that Plaintiffs were given sufficient notice of this argument to satisfy Rule 50. This Court notes as an initial matter that Defendants' new theory can in no way be construed as a "minor variance" from the grounds asserted in their motion for directed verdict. However, because it appears unlikely that Plaintiffs' presentation of their case would have been any different had Defendants asserted this argument earlier, the Court will address the merits of the argument.

■ Defendants' most recent argument—i.e., that Plaintiffs could not establish actionable infringement of their rights under the Landrum–Griffin Act without at least showing that Defendants' state lawsuit was a "sham"—presents a closer question. In its broadest form, the argument rests on the purely legal question whether bringing a lawsuit can *ever* constitute infringement of Landrum–Griffin rights. If this Court were to answer this question in the negative, Plaintiffs' claims under the LMRDA would be foreclosed, regardless of any additional evidence Plaintiff could have presented at trial. In that event, Plaintiffs would not have been deprived of any meaningful opportunity to cure defects in their case.

Defendants' argument can also be construed as turning on the more fact-based question whether Plaintiffs could show that the state lawsuit was a "sham" proceeding. Had Plaintiffs been aware of this argument during the trial, they might have tailored

their presentation of evidence bearing on Defendants' motives for bringing the state action to more squarely assert that the state suit was indeed a "sham." This Court is reluctant to speculate that earlier articulation of this theory would have had no effect on Plaintiffs' case. *Cf. Francis v. Clark Equip. Co.,* 993 F.2d 545, 555 (6th Cir.1993) (construing Rule 50 as dictating that "the non-moving party must be apprised of the dispositive issues and afforded an opportunity to present *any* available evidence").

If Defendants' argument is viewed as a failure to properly instruct the jury, however, a different analysis pertains. Although erroneous jury instructions can provide the basis for ordering a new trial, Federal Rule of Civil Procedure 51 flatly requires parties to call such alleged errors to the attention of the trial court:

> No party may assign as error the giving or the failure to give an instruction unless that party objects thereto before the jury retires to consider its verdict, stating distinctly the matter objected to and the grounds of the objection.

Because Defendants failed to object to the jury instructions in time to give the Court an opportunity to cure any defects, Rule 51 appears to preclude this Court's consideration of Defendants' most recent theory.

A Supreme Court case, however, offers Defendants the possibility of avoiding the Rule 51 bar by combining two contentions. In *Boyle v. United Technologies Corp.,* 487 U.S. 500, 513–14, 108 S.Ct. 2510, 2519, 101 L.Ed.2d 442 (1988), the Court found that an appellate court may enter judgment as a matter of law despite a failure to object to a jury instruction at trial if the instruction erroneously stated the law *and* the evidence

presented at trial was insufficient as a matter of law to support a jury verdict under the correct statement of the law. *Boyle* thus suggests that Defendants would be entitled to judgment as a matter of law if they could show both: (1) that the Court erroneously failed to instruct the jury that Plaintiffs could prevail only if they showed that the state lawsuit was a "sham," and (2) that the evidence at trial was insufficient as a matter of law to establish that the state lawsuit was a "sham." In considering the second point, though, this Court again runs afoul of the difficulty discussed above in its Rule 50 analysis: Plaintiffs' evidence might have been different had they been properly apprised of Defendants' contention during the trial.[3]

In short, this Court's survey of the relevant Rules and case law has failed to uncover any clear support for the proposition that a trial court may address an argument presented for the first time in a post-trial motion, particularly when that argument turns partly on factual determinations. Accordingly, this Court appears to be precluded from considering Defendants' most recent argument. However, because this is a close question, and because the argument can be construed as turning on purely legal issues, this Court believes that the most appropriate course of action is to address the merits of Defendants' theory.[4]

## B. THE STATE COURT LAWSUIT NEED NOT HAVE BEEN "DISCIPLINE" WITHIN THE MEANING OF § 411(a)(5) TO CONSTITUTE A VIOLATION OF § 411(a)(2).

■ Title I of the Labor–Management Reporting and Disclosure Act, 29 U.S.C.

---

**3.** Although *Boyle* does not address this concern, the case upon which *Boyle* relies, *City of St. Louis v. Praprotnik,* 485 U.S. 112, 119–20, 108 S.Ct. 915, 921–22, 99 L.Ed.2d 107 (1988), specifically notes that the party claiming error in a jury instruction had raised and preserved the relevant legal issues by filing a pretrial motion for summary judgment, a motion for directed verdict, and a motion for judgment notwithstanding the law. The opposing party thus was put on notice, both before and during the trial, of the issues involved in the dispute over the jury instruction. Defendants here cannot show that Plaintiffs were

similarly apprised of Defendants' most recent argument. *Cf. Graham v. Davis,* 880 F.2d 1414, 1420 (D.C.Cir.1989) (distinguishing *Praprotnik* on the ground that the party objecting to jury instructions had at best raised the underlying legal issues by submitting proposed instructions during the trial that stated the law differently).

**4.** Plaintiffs also contend that argument IV above—i.e., that Plaintiffs failed to exhaust internal union remedies—should not be addressed by this Court. The Court agrees, but for a different reason discussed later in this opinion.

§§ 411–415, provides a number of protections to union members, including the right to free speech and assembly, the right to sue, and the right not to be improperly disciplined. Section 411(a)(2)—the subsection upon which Plaintiffs rely—provides:

> Every member of any labor organization shall have the right to meet and assemble freely with other members; and to express any views, arguments, or opinions; and to express at meetings of the labor organization his views, upon candidates in an election of the labor organization or upon any business properly before the meeting, subject to the organization's established and reasonable rules pertaining to the conduct of meetings: *Provided,* That nothing herein shall be construed to impair the right of a labor organization to adopt and enforce reasonable rules as to the responsibility of every member toward the organization as an institution and to his refraining from conduct that would interfere with its performance of its legal or contractual obligations.

Defendants, in their initial post-trial brief, argue that § 411(a)(2) protects a member's rights to free speech only as defined by the Act, and that the Act does not create a right to commit an intentional tort such as defamation against union officials. Because defamatory statements are not protected by the Act, Defendants surmise that Local 243's state court defamation suit could not have constituted "discipline" of Plaintiffs within the meaning of § 411(a)(5).[5] In addition, although Defendants strenuously deny that there was any union complicity in the decision to bring the state court defamation action, they argue that the Union nonetheless would have been justified in taking action to protect its image with its rank-and-file members, because lack of trust among members "would interfere with its performance of its legal or contractual obligations" within the meaning of § 411(a)(2).

These arguments are flawed for several reasons, not the least of which is the fact that the jury found Defendants' defamation claim to be without merit. Furthermore, it is unclear how the allegedly defamatory nature of Plaintiffs' statements bears on the propriety of the Union's disciplinary procedures.[6] Surely disciplinary procedures, should a union choose to employ them, must conform to the dictates of § 411(a)(5) regardless of the offensive nature of the union member's conduct. Finally, even if Local 243 were correct in its contention that § 411(a)(2) authorizes a response to Plaintiffs' statements because of their potential to interfere with the Local's ability to function as an institution, § 411(a)(2) also makes clear that establishment of appropriate rules and initiation of disciplinary proceedings pursuant to those rules would have been the appropriate course of action.

In their supplemental brief, Defendants attempt to establish the relevance of § 411(a)(5) to the instant matter by directing the Court's attention—for the first time—to two cases involving the filing of civil or criminal complaints against union members. In *Morrissey v. National Maritime Union of America,* 544 F.2d 19, 22 (2d Cir.1976), a union member who opposed the established union leadership attempted to distribute pamphlets expressing his point of view at the union hall in violation of a posted sign indicating that only union publications could be distributed inside the hall. After Morrissey was asked to stop and refused to do so, he was arrested and charged with disorderly conduct and criminal trespass. 544 F.2d at 22. Both charges were eventually dismissed, and Morrissey then brought a civil suit pursuant to §§ 411(a)(2) *and* (5) against the union and several of its officials. 544 F.2d at 22. He argued that actions taken by union officials "in prohibiting and preventing him from distributing the pamphlets in the Union Hall deprived him" of his free speech rights

---

**5.** Section 411(a)(5) of the Act states:
No member of any labor organization may be fined, suspended, expelled, or otherwise disciplined except for nonpayment of dues by such organization or by any officer thereof unless such member has been (A) served with written specific charges; (B) given a reasonable time

to prepare his defense; (C) afforded a full and fair hearing.

**6.** This assumes that § 411(a)(5) has some relevance to this case, a proposition that will be explored later in this opinion.

under § 411(a)(2), and that "their causing his arrest constituted improper disciplinary action in violation of 29 U.S.C. § 411(a)(5)." 544 F.2d at 22 (quoting *Morrissey v. National Maritime Union,* 397 F.Supp. 659, 663 (S.D.N.Y.1975)). The jury returned a general verdict finding that the defendants had violated § 411(a) of the Landrum–Griffith Act, without specifying whether the violation had been of § 411(a)(2) or § 411(a)(5) or both. 544 F.2d at 23.

The Court of Appeals for the Second Circuit first found that the evidence adduced at trial was sufficient to support a verdict against the defendants under § 411(a)(2). 544 F.2d at 23–24. The defendants had argued that their conduct fell within the § 411(a)(2) proviso that permits unions to "adopt and enforce reasonable rules." 544 F.2d at 23. The court, however, agreed with the trial court that it was unnecessary to inquire into the reasonableness of the rule posted in the union hall, because that rule was posted by an individual union officer without first having been "adopted" by the union within the meaning of the § 411(a)(2) proviso. 544 F.2d at 24.

Nevertheless, the *Morrissey* court reversed the general verdict for the plaintiff, based on its conclusion that the defendants had not violated § 411(a)(5) of the Landrum–Griffith Act. 544 F.2d at 25–26. The court reasoned that because the focus of § 411(a)(5) is to provide due process protections before a union may discipline its members, that subsection does not extend to proceedings such as criminal prosecutions where the judicial system will provide the necessary procedural protections:

> The scope of the prohibition is best illumined by Congress' statement of the conditions that will overcome it. Congress desired to provide "safeguards against improper disciplinary action," not to outlaw union discipline. A union may "otherwise discipline" a member, just as it may fine, suspend or expel him, if it has served him with written specific charges, has given him a reasonable time to prepare his defenses, and has afforded him a full and fair hearing. At least in this context, the phrase "otherwise disciplined" must be limited to types of punishment where compliance with these conditions is feasible. The compulsory steps would take weeks, even months. The "otherwise disciplined" phrase could thus not have been meant to cover a decision to call a policemen to remove a member from a union's premises.
>
> We do not say, of course, that "discipline" may not be involved in union sanctions arising from incidents that would otherwise be violations of law, cf. *International Bhd. of Boilermakers v. Hardeman,* 401 U.S. 233, 91 S.Ct. 609, 28 L.Ed.2d 10 (1971) (expulsion following assault on union official). *We do say that Congress could not have been thinking of a case like this where the union chooses to invoke the processes of law and the arrested union member will have his full range of procedural protections in the courts.* If the decision to have him arrested and prosecuted is itself unjustified, he will have other legal remedies, as this case demonstrates [i.e., a malicious prosecution claim]; Title I has no preemptive effect on such remedies, [29 U.S.C. § 413]. We thus conclude it was error for the judge to have allowed the jury to find the defendants liable for violating [§ 411(a)(5) ].

544 F.2d at 26 (emphasis added) (footnote omitted). Thus, contrary to Defendants' contention, *Morrissey* did not hold that pursuit of a state court action cannot be considered an act in violation of § 411(a)(2); rather, that court held that a state prosecution could not be considered discipline for purposes of determining violations of § 411(a)(5).

Similarly, in the second case cited by Defendants, *Phillips v. International Assoc. of Bridge, Structural and Ornamental Iron Workers,* 556 F.2d 939, 941 (9th Cir.1977), the issue was "whether malicious prosecution of a civil suit by a labor organization or its officers acting in their official capacity against a member constitutes 'discipline' within the meaning of § 411(a)(5)." Relying on *Morrissey, supra,* the court concluded that malicious prosecution is not "discipline" within the meaning of the Act. 556 F.2d at 941–42. The court reasoned:

> Judicial process will assure [a union member] that before judgment is rendered he

will have notice of the specific charges on which the suit is based, time to prepare a defense and a full and fair hearing, and, if the judicial process was invoked improperly against the union member, he will have the full range of remedies provided by law. 556 F.2d at 941. *Morrissey* and *Phillips*, therefore, both stand for the proposition that when a union decides to bring charges against a member through the judicial system, as opposed to through union disciplinary procedures, there is no need for the procedural protections afforded to union members by § 411(a)(5).

This Court finds it unnecessary to address the *Morrissey–Phillips* construction of § 411(a)(5), because the principle announced in those cases concerning § 411(a)(5) simply is not applicable to the instant matter. Plaintiffs did not allege, nor did they argue before the jury, that the state court action filed against them by the individual Defendants constituted "discipline" within the meaning of § 411(a)(5). They do not claim that they were denied procedural protections. Rather, they claim that their substantive free speech rights, as protected by § 411(a)(2), were infringed by a retaliatory lawsuit designed to stop them from speaking out in the future. Nothing in *Morrissey* or *Phillips* defeats this claim. *See Murphy v. International Union of Operating Eng'rs*, 774 F.2d 114, 121–22 (6th Cir.1985) (citing *Morrissey* but still finding that "a suit may be brought to redress an infringement of section 411 rights even if no improper 'discipline' is shown").

Indeed, after addressing and rejecting a § 411(a)(5) claim, *Phillips* recognized that a retaliatory lawsuit may form the basis of a Title I infringement claim. 556 F.2d at 942. The plaintiffs in *Phillips* alleged that the union had filed suit against them in order to prevent them from prosecuting actions they previously had filed against the union in a state court and before the National Labor Relations Board ("NLRB"). 556 F.2d at 940. As union members, their right to file such actions is protected by § 411(a)(4).[7] The *Phillips* court thus considered "whether the bringing of the malicious civil actions [by the union] ... can be said to have limited the right of [the union member plaintiffs] to institute or to continue" NLRB and court actions protected by § 411(a)(4). 556 F.2d at 942. After noting that in a previous case, *Operating Eng'rs Local Union No. 3 v. Burroughs*, 417 F.2d 370 (9th Cir.1969), the Ninth Circuit had found that disciplining a member through imposition of a fine for bringing a suit against the union constituted a violation of § 411(a)(4), the court stated:

> It is thus established that the taking of retaliatory action against the member for having brought suit can operate to limit the right of that member to institute suit under this subsection. The fact that in *Burroughs* the union retaliation was by union discipline for violation of a formal union rule, while here it was by way of malicious court actions, does not affect the result. If a union member's right to sue is to have any meaning, courts must be ever vigilant in protecting that right against indirect and subtle devises as well as against direct and obvious limitations.

556 F.2d at 942 (footnote omitted). Accordingly, the court reversed a lower court ruling dismissing the plaintiff's complaint for failure to state a claim under § 411(a)(4). 556 F.2d at 942.

As in *Phillips*, the Plaintiff union members in the instant matter seek protection of Title I rights that have allegedly been infringed

7. Section 411(a)(4) states:

No labor organization shall limit the right of any member thereof to institute an action in any court, or in a proceeding before any administrative agency, irrespective of whether or not the labor organization or its officers are named as defendants or respondents in such action or proceeding, or the right of any member of a labor organization to appear as a witness in any judicial, administrative, or legislative proceeding, or to petition any legislature or to communicate with any legislator: *Provid-* ed, That any such member may be required to exhaust reasonable hearing procedures (but not to exceed a four-month lapse of time) within such organization, before instituting legal or administrative proceedings against such organizations or any officer thereof: *And provided further*, That no interested employer or employer association shall directly or indirectly finance, encourage, or participate in, except as a party, any such action, proceeding, appearance, or petition.

through a retaliatory lawsuit. Here, the rights that they seek to protect are those free speech rights protected under § 411(a)(2). Clearly, the threat of a lawsuit and its attendant financial burdens could suppress those protected rights. Consequently, this Court concludes that Plaintiffs' claim of a violation of their § 411(a)(2) rights was properly presented to the jury.

### C. SUFFICIENT EVIDENCE OF UNION COMPLICITY WAS AVAILABLE FOR SUBMISSION OF THE CASE TO A JURY.

■ Defendants, in both their original and supplemental briefs, attack the evidence concerning union complicity, arguing that it was insufficient for the jury to conclude that Local 243 participated in the state court action filed against Plaintiffs. Their attack seeks to discredit the available circumstantial evidence by examining it in a piecemeal fashion. Although any one of these pieces of evidence by itself might be insufficient for a finding of complicity, the evidence as a whole certainly was sufficient for the jury to conclude that the lawsuit was advanced and supported by the Union. Because this Court cannot say that no reasonable jury could find in Plaintiffs' favor, granting judgment as a matter of law would be inappropriate. Furthermore, because this Court, upon reviewing the record, does not have a firm conviction that the jury reached the wrong conclusion, granting a new trial would be inappropriate. Indeed, the Court is convinced that the jury properly weighed the evidence.

In its May 27, 1993, Opinion and Order denying Defendants' motion for summary judgment, this Court relied principally upon four pieces of evidence of union complicity to preclude summary judgment: (1) a newspaper article in the Detroit Free Press in which a "Teamster spokesman" is quoted as saying that the purpose of the lawsuit was to "tem-

per" Plaintiffs in the upcoming union election; (2) the fact that all of the members of the executive board of Local 243 participated in the state court litigation; (3) Defendant Union's admission in paragraph fourteen of its answer to the complaint that some work associated with the lawsuit was performed on Union time; and (4) the fact that some of this work was performed at Union offices. Further, it was alleged and then proven that a union organizer, Thomas Ziembovic, effected service of process on Plaintiffs. At trial, the jury was presented with evidence concerning all of these items, with the exception of the Detroit Free Press article, which was excluded from the case.[8] Consequently, this Court concludes that the jury's finding of union complicity was supported by the evidence.

### D. SUFFICIENT EVIDENCE OF IMPROPER MOTIVE WAS AVAILABLE FOR ·SUBMISSION OF THE CASE TO A JURY.

■ As with complicity, Defendants attack the evidence concerning improper motive in a piecemeal fashion, and fail to mention some of its more damaging aspects. The Court is confident that the jury reasonably found that the state lawsuit was filed with an improper motive. The timing of the lawsuit and Defendants' failure to prosecute it were telling indicia of that motive. Defendants brought the state court defamation action in the midst of a union election campaign in which Plaintiffs were opposing them. After the election was over and Defendants had won, they then largely failed to pursue their suit or participate in discovery. Indeed, several of the Defendants were involuntarily dismissed from the state court litigation due to their failure to appear for depositions. The remaining litigants eventually abandoned the action despite the fact that they had survived a motion for summary

---

8. In an effort to determine whether the "Teamster spokesman" quoted in the Detroit Free Press article truly was a spokesperson for the Union, the reporter who wrote the article was subpoenaed to testify concerning the source of the comment attributed to that spokesperson. After a hearing, the Court found that the reporter could not be compelled to divulge his source, and the reporter refused to do so voluntarily. Because the comment in the article was offered both for its truth—i.e., that the purpose of the state lawsuit was to "temper" Plaintiffs—and to show union complicity in the lawsuit, and because, pursuant to the Court's ruling, neither basis for admission could be established, the Court excluded the article on both foundation and hearsay grounds.

disposition. Their failure to pursue the defamation action to its conclusion strongly suggests that their motive was improper. The jury so found, and this Court does not believe such a finding to be against the weight of the evidence.

■ Relying on *Gertz v. Robert Welch, Inc.*, 418 U.S. 323, 94 S.Ct. 2997, 41 L.Ed.2d 789 (1974), Defendant Union also argues that the jury should have been instructed that Plaintiffs must prove retaliatory motive by clear and convincing, as opposed to preponderant, evidence. *Gertz* held that *public figures*, who often intentionally seek public attention, may not recover for alleged defamation by a news organization absent a showing, by clear and convincing evidence, that the organization had at least a reckless disregard for the truth. 418 U.S. at 342, 94 S.Ct. at 3008. Defendant Union asserts that the decision of the individual Defendants to file a lawsuit, like the decision of a publisher to print information about public figures, is protected by the First Amendment. It follows, according to Defendant, that proof of improper motive must be by clear and convincing evidence.

Among the reasons cited by the *Gertz* Court as justification for imposing a heightened standard of proof on public figures who elect to bring defamation suits against news organizations, the Court pointed to significant differences between public and private figures [9] and the need for protection of the press. 418 U.S. at 342–44, 94 S.Ct. at 3008–09. Neither of these concerns is present here. Moreover, *Gertz* held that the high standard of proof and degree of malice required in public figure defamation cases need not be extended to cases involving private figures. 418 U.S. at 345–46, 94 S.Ct. at 3010. Rather, "so long as they do not impose liability without fault, the States may define for themselves the appropriate standard of liabil-

ity for a publisher or broadcaster of defamatory falsehood injurious to a private individual." 418 U.S. at 347, 94 S.Ct. at 3010. Because Plaintiffs are not public figures, Defendant Union's reliance on *Gertz* is without merit.

The *Gertz* Court's First Amendment analysis is also inapplicable here because of the sources of the competing rights at issue. Although the First Amendment defines the right of the individual Defendants to bring a defamation suit, Title I of the LMRDA grants Plaintiffs the free speech rights they seek to vindicate in the instant suit. Nothing in § 411(a)(2) requires an elevated standard of proof, nor is there any case law which even implies that such a standard should apply.[10] In this situation, the Court sees no basis, either in law or policy, to insist upon such a standard.

**E. EXHAUSTION OF INTERNAL UNION REMEDIES IS NOT REQUIRED.**

■ Next, the Court rejects Defendants' argument that Plaintiffs' failure to exhaust internal union remedies should bar their action.[11] As an initial matter, the exhaustion requirement under Title I of the Landrum–Griffin Act plainly is permissive, not mandatory: "any such [labor organization] member *may* be required to exhaust reasonable hearing procedures … within such organization, before instituting legal or administrative proceedings against such organizations or any officer thereof.…" 29 U.S.C. § 411 (emphasis added); *see also NLRB v. Industrial Union of Marine & Shipbuilding Workers*, 391 U.S. 418, 426, 88 S.Ct. 1717, 1723, 20 L.Ed.2d 706 (1968) ("We conclude that 'may be required' is not a grant of authority to unions more firmly to police their members but a statement of policy that the public

9. In particular, the Court reasoned that "public figures usually enjoy significantly greater access to the channels of effective communication and hence have a more realistic opportunity to counteract false statements [than] private individuals normally enjoy." 418 U.S. at 344, 94 S.Ct. at 3009.

10. Indeed, if a heightened standard of proof were to apply at all, it would seem that it would

have applied to Defendants' defamation claims against Plaintiffs, because the individual Defendants, as union officers, arguably are "limited purpose" public figures. *See Gertz*, 418 U.S. at 351, 94 S.Ct. at 3013.

11. Counsel for Defendant Local 243 appeared to abandon this argument at the hearing on this matter.

tribunals whose aid is invoked may in their discretion stay their hands ... while the aggrieved person seeks relief within the union."); *Bise v. International Bhd. of Elec. Workers,* 618 F.2d 1299, 1303 (9th Cir.1979) ("[T]he requirement of exhaustion of union remedies is a matter within the sound discretion of the courts." (footnote omitted)), *cert. denied,* 449 U.S. 904, 101 S.Ct. 279, 66 L.Ed.2d 136 (1980).

This Court thus invokes its discretion to waive the exhaustion requirement in this case. In support of this decision, the Court notes that a number of courts have singled out free speech actions as warranting waiver of the exhaustion requirement. *See, e.g., Bradford v. Textile Workers,* 563 F.2d 1138, 1140–41 (4th Cir.1977) (recognizing exception to exhaustion requirement when free speech rights are implicated); *Koenig v. Clark,* 536 F.Supp. 753, 762 (D.N.J.1982) (excusing exhaustion requirement in part because "plaintiff's allegations against the union and its officers include interference with protected speech rights"). The reason for such special concern for free speech claims is obvious. Congress passed the Landrum–Griffin Act to police internal union affairs. Although a union and its officers may be well-equipped to review discipline imposed for other forms of alleged misconduct, claims involving speech—especially when that speech is critical of current union leadership—often will demand independent review to ensure a just outcome.

■ In addition, this Court believes that by not raising the exhaustion issue prior to this motion, Defendants have waived it. *See International Bhd. of Boilermakers Local 1603 v. Transue & Williams Corp.,* 879 F.2d 1388, 1396 n. 3 (6th Cir.1989) (failure to plead limitations defense until post-trial motion constituted waiver of that defense).

### F. *COMMENCEMENT OF A LAWSUIT MAY CONSTITUTE INFRINGEMENT OF LANDRUM–GRIFFIN RIGHTS.*

Relying on *Eastern Railroad Presidents Conference v. Noerr Motor Freight,* 365 U.S.

127, 81 S.Ct. 523, 5 L.Ed.2d 464 (1961), *United Mine Workers v. Pennington,* 381 U.S. 657, 85 S.Ct. 1585, 14 L.Ed.2d 626 (1965), *California Motor Transp. Co. v. Trucking Unlimited,* 404 U.S. 508, 92 S.Ct. 609, 30 L.Ed.2d 642 (1972), and other cases, Defendant Local 243 argues in its supplemental brief that, by virtue of First Amendment protection, the bringing of a civil lawsuit can never be considered a violation of the Landrum–Griffin Act, or, alternatively, that it can be considered a violation of the Act only if it was a "sham" proceeding. The Local argues that, at the very least, the jury should have been told that they could find in favor of Plaintiffs only if they first determined that the state court lawsuit was a complete sham.[12] Defendant Local 243 further contends that the Court exacerbated its failure to properly instruct the jury by submitting Defendants' defamation counterclaim to the jury at the same time, thereby implicitly instructing the jury that it was possible to find in favor of Plaintiffs while also determining that Defendants' defamation claim was meritorious.

■ *Noerr* and *Pennington, supra,* taken together, establish a principle of law often referred to as the *Noerr–Pennington* doctrine. "That doctrine holds that business interests may combine and lobby to influence the legislative, executive, or judicial branches of government or administrative agencies without violating the antitrust laws, because such activities are protected by the first amendment right of petition." *Eaton v. Newport Bd. of Educ.,* 975 F.2d 292, 298 (6th Cir.1992), *cert. denied,* —— U.S. ——, 113 S.Ct. 2459, 124 L.Ed.2d 674 (1993). Although the doctrine applies "regardless of the motives of the petitioners," 975 F.2d at 298, it is not without exception. "The Supreme Court has carved out a narrow 'sham' exception to this doctrine, which covers cases where the defendant intended to use the petitioning process merely to harass the plaintiff." 975 F.2d at 298.

---

12. It should be noted that at trial Defendants neither requested a jury instruction to this effect nor objected to the instruction actually given.

In *Bill Johnson's Restaurants, Inc. v. NLRB*, 461 U.S. 731, 103 S.Ct. 2161, 76 L.Ed.2d 277 (1983), the Supreme Court discussed the parameters of the "sham" exception within the context of the National Labor Relations Act ("NLRA"). The question before the Court in that case was "whether the National Labor Relations Board may issue a cease-and-desist order to halt the prosecution of a state-court civil suit brought by an employer to retaliate against employees for exercising federally-protected labor rights, *without also finding that the suit lacks a reasonable basis in fact or law.*" 461 U.S. at 733, 103 S.Ct. at 2165 (emphasis added). The case arose when an employee of Bill Johnson's Restaurants was fired after engaging in union organizing activities. 461 U.S. at 733, 103 S.Ct. at 2165. The discharged employee filed unfair labor practice charges with the NLRB, and, with the aid of fellow employees, began a picketing campaign at the restaurant that included distribution of a leaflet alleging wrongdoing by restaurant management. 461 U.S. at 733–34, 103 S.Ct. at 2165. The restaurant and three of its co-owners filed a complaint in state court seeking injunctive relief from the picketing activity and damages for, among other things, allegedly libelous statements made in the leaflet. 461 U.S. at 734, 103 S.Ct. at 2165. In response to this state court litigation, the former employee filed additional charges with the NLRB, claiming that the restaurant had filed the state suit in retaliation for her protected activities, including her initial decision to file charges with the NLRB. 461 U.S. at 734–35, 103 S.Ct. at 2165. The General Counsel for the NLRB issued a complaint against the restaurant alleging unfair labor practices.[13] 461 U.S. at 735, 103 S.Ct. at 2165.

After noting that the broad scope of the NLRA provided some support for the Board's position that a civil lawsuit can be an unfair labor practice, and thus can be enjoined, if it is pursued with a retaliatory motive, the Court cited "weighty countervailing considerations." 461 U.S. at 740–41, 103 S.Ct. at 2168–69. In particular, the Court discussed its development of the "sham" exception in an earlier case arising under antitrust law:

> In *California Motor Transport Co. v. Trucking Unlimited,* 404 U.S. 508, 510, 92 S.Ct. 609, 611, 30 L.Ed.2d 642 (1972), we recognized that the right of access to the courts is an aspect of the First Amendment right to petition the Government for redress of grievances. Accordingly, we construed the antitrust laws as not prohibiting the filing of a lawsuit, regardless of the plaintiff's anticompetitive intent or purpose in doing so, unless the suit was a "mere sham" filed for harassment purposes.

461 U.S. at 741, 103 S.Ct. at 2169 (citation omitted). The Court reasoned that this same First Amendment right should inform its construction of the NLRA, and concluded:

> The filing and prosecution of a *well-founded* lawsuit may not be enjoined as an unfair labor practice, even if it would not have been commenced but for the plaintiff's desire to retaliate against the defendant for exercising rights protected by the Act.

461 U.S. at 741–43, 103 S.Ct. at 2169–70 (emphasis added).

Apart from its desire to protect the First Amendment right of employers to seek redress in state court, the Court in *Bill John-*

---

13. Those allegations were based on a provision in the NLRA defining unfair labor practices by an employer. *See* 29 U.S.C. § 158(a). That provision states, in relevant part:

> It shall be an unfair labor practice for an employer—
> (1) to interfere with, restrain, or coerce employees in the exercise of rights guaranteed in section [7 of the Act];
>
> \* \* \* \* \* \*
>
> (4) to discharge or otherwise discriminate against an employee because he has filed charges or given testimony under this Act.

Section 7 guarantees employees "the right to self-organization, to form, join, or assist labor organizations, ... and to engage in other concerted activities for the purpose of collective bargaining or other mutual aid or protection." 29 U.S.C. § 157.

*son's* cited two additional factors that entered into its decision. First, the Court was concerned with limiting the power of the federal government to interfere with state court litigation. The Court recognized a "substantial state interest 'in protecting the health and well-being of its citizens.'" 461 U.S. at 742, 103 S.Ct. at 2169 (quoting *Farmer v. United Bhd. of Carpenters & Joiners, Local 25,* 430 U.S. 290, 303, 97 S.Ct. 1056, 1065, 51 L.Ed.2d 338 (1977)). Second, the Court recognized that because the NLRB is powerless to grant relief to employers, "[i]f the Board is allowed to enjoin the prosecution of a well-grounded state lawsuit, it necessarily follows that any state plaintiff subject to such an injunction will be totally deprived of a remedy for an actual injury." 461 U.S. at 742, 103 S.Ct. at 2169 (citing *Linn v. United Plant Guard Workers,* 383 U.S. 53, 63, 86 S.Ct. 657, 663, 15 L.Ed.2d 582 (1966)).

After announcing a general rule and discussing its underlying bases, the Court described the steps the NLRB should take "in evaluating whether a state-court suit lacks the requisite basis." 461 U.S. at 744, 103 S.Ct. at 2170. The Court held:

> [I]f there is a genuine issue of material fact that turns on the credibility of witnesses or on the proper inferences to be drawn from undisputed facts, it cannot, in our view, be concluded that the suit should be enjoined. When a suit presents genuine factual issues, the state plaintiff's First Amendment interest in petitioning the state court for redress of his grievance, his interest in having the factual dispute resolved by a jury, and the State's interest in protecting the health and welfare of its citizens, lead us to construe the Act as not permitting the Board to usurp the traditional factfinding function of the state-court jury or judge. Hence, we conclude that if a state plaintiff is able to present the Board with evidence that shows his lawsuit raises genuine issues of material fact, the Board should proceed no further with the § 8(a)(1)–§ 8(a)(4) unfair labor practice proceedings but should stay those proceedings until the state-court suit has been concluded.

461 U.S. at 745–746, 103 S.Ct. at 2171 (footnotes omitted). In a footnote, the Court suggested that the NLRB consult the standards used by courts to decide motions for directed verdict and summary judgment. 461 U.S. at 745 n. 11, 103 S.Ct. at 2171 n. 11. Furthermore, "[j]ust as the Board must refrain from deciding genuinely disputed material factual issues with respect to a state suit, it likewise must not deprive a litigant of his right to have genuine state-law legal questions decided by the state judiciary." 461 U.S. at 746, 103 S.Ct. at 2172 (footnote omitted).

■ Accordingly, when presented with an unfair labor practice claim that also seeks to enjoin the employer's prosecution of a state court lawsuit against the union or its members, the NLRB must stay its proceedings if the state suit has arguable merit, regardless of the employer's motivation for bringing the suit. Once the state court litigation has ended, however, the NLRB may proceed as follows:

> In instances where the Board must allow the lawsuit to proceed, if the employer's case in the state court ultimately proves meritorious and he has judgment against the employees, the employer should also prevail before the Board, for the filing of a meritorious lawsuit, even for a retaliatory motive, is not an unfair labor practice. If judgment goes against the employer in the state court, however, *or if his suit is withdrawn* or is otherwise shown to be without merit, the employer has had its day in court, the interest of the State in providing a forum for its citizens has been vindicated, and the Board may then proceed to adjudicate the § 8(a)(1) and § 8(a)(4) unfair labor practice case. The employer's suit having proved unmeritorious, the Board would be warranted in taking that fact into account in determining whether the suit had been filed in retaliation for the exercise of the employee's § 7 rights.

*Bill Johnson's,* 461 U.S. at 747, 103 S.Ct. at 2172 (emphasis added); *see also Johnson & Hardin Co. v. NLRB,* 49 F.3d 237, 242–243 (6th Cir.1995); *Diamond Walnut Growers, Inc. v. NLRB,* 53 F.3d 1085, 1089 (9th Cir. 1995) ("Although ... the mere lack of a

lawsuit's success does not by itself establish retaliation, it may be taken into account along with other factors in determining retaliatory motive."); *NLRB v. International Union of Operating Eng'rs, Local 520*, 15 F.3d 677, 679 (7th Cir.1994) ("[I]f a union's lawsuit has been finally adjudicated and the union has not prevailed, its lawsuit is deemed meritless." (footnote omitted)).

■ In sum, although *Bill Johnson's* proscribes federal interference with arguably meritorious state court actions, the Court did not completely forbid federal involvement. If a state court action utterly lacks merit, the Board may properly enjoin it. Moreover, and more to the point in the instant matter, federal interests may be freely asserted once the state court litigation has ended and the threat of interference no longer exists. At that point, a federal authority may find that the state court lawsuit was filed in bad faith, even if it was not so lacking in merit as to warrant an earlier injunction. Indeed, the Court in *Bill Johnson's* found that termination of the state court suit diminishes the Board's obligation to examine that suit's allegations for any signs of possible merit. The Board instead may rely on the disposition of the state court action, *even if it was not disposed of on the merits.* A state lawsuit therefore could survive summary judgment and nevertheless be deemed meritless by the Board, so long as the suit did not ultimately terminate in the plaintiff's favor.

The principles announced in *Bill Johnson's* readily extend to cases like the instant one that involve alleged retaliation for exercise of Landrum–Griffin Act rights. In particular, none of the concerns that prompted the Supreme Court's limitation of NLRB power to enjoin state lawsuits is present here. Plaintiffs do not seek an injunction to halt prosecution of a state action; rather, they seek compensation for the injury they suffered as a result of previously concluded litigation. Accordingly, "the interest of the State in providing a forum for its citizens has been vindicated." *Bill Johnson's,* 461 U.S. at 747, 103 S.Ct. at 2172.

Moreover, Defendants' First Amendment right of access to the courts has not been diminished in any way. Defendants had

their day in state court; they chose to withdraw their lawsuit well before the instant action was filed. Beyond that, by pursuing their defamation claims anew in this Court, Defendants further vindicated their First Amendment rights. Unlike the NLRB, this Court has the power to compensate the individual Defendants for Plaintiffs' allegedly tortious conduct toward them. The jury simply chose not to.

Furthermore, although *Bill Johnson's* does not require an express finding that a previously concluded lawsuit was a "sham" proceeding, this Court has already determined that the record amply supports a determination that the state court action initiated by Defendants was a "sham" brought only for the purpose of harassment. As discussed above, not only did the individual Defendants withdraw from the suit after the election was over, but they also refused to participate in discovery or submit to depositions, despite the fact that they were the parties who had initiated the suit.

These indications of an improper motive thus distinguish the instant case from *Eaton v. Newport Bd. of Educ.,* 975 F.2d 292 (6th Cir.1992), in which the court invoked the *Noerr–Pennington* doctrine to shield the defendants from liability. The plaintiff in *Eaton* had been discharged from his position as a school principal, and he alleged that this discharge resulted in part from actions taken by two defendants, the Kentucky Education Association ("KEA") and its managing agent, in support of their belief that Eaton should be dismissed for having made a racist remark. 975 F.2d at 296–97. Eaton claimed that the defendants had organized a demonstration against him at a school board meeting, and that the KEA had threatened to file a lawsuit against the school board if they did not fire him. 975 F.2d at 295. The court held that the defendants were entitled to judgment as a matter of law:

> [A]ll of the actions taken by the defendants, even if everything Eaton says is true, are simply not actionable because they are all protected by the first amendment. In short, what Eaton attempts to characterize as a conspiracy is more accu-

rately and commonly known as free expression and political organizing.

975 F.2d at 297.

Defendant Local 243 argues that *Eaton* controls the instant case because the filing of the state lawsuit by the individual Defendants was protected by the First Amendment. However, the tort of malicious prosecution belies Defendant's broad reading of *Eaton;* litigants are subject to tort liability for bringing groundless suits notwithstanding their First Amendment rights.[14] Defendant's contention also overlooks the "sham" exception to the *Noerr–Pennington* doctrine. The *Eaton* court expressly found that the "sham" exception did not apply in that case, because the defendants had intended to achieve a permissible goal, the plaintiff's discharge, rather than intending "to use the petitioning process merely to harass the plaintiff." 975 F.2d at 298. In contrast, the jury here found that Defendants filed their state lawsuit to retaliate for Plaintiffs' exercise of their § 411(a)(2) rights, rather than to achieve the permissible object of recovering for injuries resulting from Plaintiffs' alleged defamation.

Finally, this Court finds no irreconcilable conflict between Plaintiffs' claims under the Landrum–Griffin Act and Defendants' defamation claims. Defendants' state court litigation having terminated, the jury needed only to determine whether that litigation was commenced with an improper motive. As *Bill Johnson's* demonstrates in its description of the NLRB's course of action once a state lawsuit has ended, the jury here was not required to examine the underlying merits of Defendants' state lawsuit in order to resolve Plaintiffs' claims. *Bill Johnson's* suggests that the jury would have been precluded as a matter of law from finding that the state lawsuit was improperly brought *only if* Defendants had prevailed in that earlier suit. Because they did not, the question of Defendants' motives in bringing the earlier

suit was left to the jury. The possible merit of that earlier suit was at most a factor the jury was free to consider in determining whether Defendants' motives were improper. Thus, although there may be some common issues, the *merit* of Defendants' defamation claims is a distinct question from Defendants' *motives* in bringing the state lawsuit.

Another district court recently reached a similar conclusion under a nearly identical set of facts. In *Morris v. Scardelletti,* No. 94–3557, 1995 WL 508210 (E.D.Pa. Aug. 21, 1995), the court considered the defendants' argument that their First Amendment right to bring a lawsuit shielded them from liability in the plaintiffs' LMRDA claims. The defendants had asserted pendant state law defamation claims in a previous federal action, but those claims had been dismissed for want of jurisdiction after the federal claims were settled. 1995 WL 508210 at *1. The defendants then reasserted their state law claims as counterclaims in the instant suit, in which the plaintiffs charged that the defendants' prior suit was filed to retaliate against the plaintiffs' rival union activities, and thus infringed their Title I rights. 1995 WL 508210 at *1. The court rejected the defendants' argument that summary judgment should be granted because the prior action "had a reasonable basis in law and fact," and thus was protected activity under the First Amendment:

> The question of whether the claims raised in [the prior action], and reraised as counterclaims here, have a reasonable basis is beyond doubt a jury issue. Among the issues that must be considered in determining "reasonableness" is the subjective intent of the [defendants] in initially bringing their claims. As we made clear [in an earlier opinion], the First Amendment rights of the defendants are in conflict with the Title I rights of the plaintiffs. It is the question of reasonableness upon which the parties' rights will diverge. *If*

---

**14.** Moreover, the availability of a malicious prosecution cause of action under state law does not render unnecessary a claim under Title I of the LMRDA. As noted by the Court in *Bill Johnson's:*

> Dual remedies are appropriate because a State has a substantial interest in deterring the filing

of baseless litigation in its courts, and the Federal Government has an equally strong interest in enforcing the federal labor laws. The Federal Government need not rely on state remedies to ensure that its interests are served. 461 U.S. at 747 n. 14, 103 S.Ct. at 2172 n. 14.

*the plaintiffs successfully prove that the intent of the defendants was to retaliate against them for their rival union activities, the jury would be within its bounds to conclude the plaintiffs suffered an abridgement [of] their Title I rights.*

1995 WL 508210 at *1 (emphasis added). The court also found that factual disputes precluded summary judgment for the plaintiffs on their LMRDA claims and the defendants' counterclaims. 1995 WL 508210 at *3. *Morris* thus supports this Court's determination that Plaintiffs' LMRDA claims were not precluded by Defendants' First Amendment protections, but instead were properly submitted to the jury along with Defendants' defamation claims.

In conclusion, because the individual Defendants' state court defamation claims were dismissed without a finding in their favor, the jury's determination that the state lawsuit infringed Plaintiffs' § 411(a)(2) rights was consistent with the law. This is so, contrary to Defendant Local 243's argument, even absent an express finding that the state lawsuit was a "sham." Accordingly, this Court finds no error in its jury instructions.

## G. *THIS COURT PROPERLY ASSESSED LIABILITY AGAINST THE INDIVIDUAL DEFENDANTS AS WELL AS DEFENDANT LOCAL 243.*

■ The individual Defendants' motion for relief from judgment is easily disposed of. Defendants correctly note that the Rule upon which they rely permits correction of judgments only on the basis of "clerical mistakes." Fed.R.Civ.P. 60(a). Citing various passages from the trial transcript, Defendants contend that the assessment of liability against the individual Defendants for violation of the Landrum–Griffin Act represents such a "clerical mistake," or at least an error that is utterly mechanical and apparent from the record. According to Defendants, the trial transcript shows that the parties and this Court all understood that only Defendant Local 243 could be held liable under Plaintiffs' LMRDA claims.

The trial transcript reflects no such common understanding. Instead, the passages cited by Defendants reflect the Court's understanding that the individual Defendants could be held liable for infringement of Plaintiffs' Title I rights only if, as the Court explicitly instructed the jury, the individual Defendants "were acting under the color of union authority" or were otherwise aided by the Local in filing their state lawsuit. (Trial Tr., June 25, 1993, at 136). The passages quoted by Defendants thus show that union complicity was an *element* of Plaintiffs' LMRDA claims, and that the individual Defendants consequently would have been free of liability if Plaintiffs had failed to establish that element. Those passages, however, neither state nor even imply that the individual Defendants would be free of liability *regardless* of Plaintiffs' showing of complicity.

Indeed, this Court has previously found *in this same litigation* that actions under Title I of the Landrum–Griffin Act can be pursued against individuals as well as unions. *Clark v. Esser,* 821 F.Supp. 1230, 1235 (E.D.Mich. 1993). The individual Defendants' belief that they were exempt from liability thus is especially unavailing here. Regardless of whether the individual Defendants were generally aware that they were subject to liability for Title I violations, they were expressly advised by this Court that they could be held liable under Plaintiffs' particular claims. Moreover, Plaintiffs specifically asserted in their trial brief that Defendant Local 243 and the individual Defendants would be jointly and severally liable for damages should Plaintiffs prevail. Finally, Plaintiffs' understanding that both the Local and the individual Defendants were subject to liability can certainly be implied from Plaintiffs' naming of all of the Defendants in their initial complaint.

The individual Defendants cannot hope to overcome these plain declarations of joint liability among *all* of the Defendants by claiming an unstated "common understanding" to the contrary. If the individual Defendants believed that they were legally exempt from liability, they would have been well advised to seek dismissal from the case on that basis. If, on the other hand, they believed that the facts could not establish their liability as individuals, the jury finding of union complicity shows that this belief was

not shared by the trier of fact. Accordingly, this Court rejects as utterly without merit the individual Defendants' contention that they were erroneously named in the Court's judgment.

## V. *CONCLUSION*

For the foregoing reasons,

NOW, THEREFORE, IT IS HEREBY ORDERED that Defendants' Motion for Judgment Notwithstanding the Verdict or in the Alternative for a New Trial be DENIED, and that the individual Defendants' Motion for Relief from Judgment also be DENIED.